THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NISSREN RABADI and ROBERT RABADI, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | 3:15-CV-00101 |
| | : | (JUDGE MARIANI) |
| GREAT WOLF LODGE OF THE POCONOS LLC, and GREAT WOLF RESORTS, INC. | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Presently before the Court is Defendants Great Wolf Lodge of the Poconos, LLC and Great Wolf Resorts, Inc.'s Motion For Summary Judgment. (Doc. 9). For the reasons that follow, Defendants' motion will be granted.

### I.   INTRODUCTION AND PROCEDURAL HISTORY

On December 9, 2014, Plaintiffs filed a complaint in the Court of Common Pleas of Monroe County. (Doc. 1). The Complaint asserts two counts of negligence against Defendants: one count on behalf of Plaintiff Nissren Rabadi and one count on behalf of Plaintiff Robert Rabadi. (Id.). On January 16, 2015, Defendants removed the action to this Court. (Id.). Thereafter, Defendants filed a Motion For Summary Judgment now pending before the Court. (Doc. 9).

## II.  **STATEMENT OF FACTS**

On December 18, 2012, Plaintiff Nissren Rabadi and her husband Raid "Robert" Robert were guests at the Great Wolf Lodge of the Poconos located in Scotrun, Pennsylvania. (Doc. 11, at ¶ 1).  Prior to this date, Plaintiffs had visited the Great Wolf Pocono property on two occasions, and had ridden the high thrill waterpark ride known as the Double Barrel Drop (the "DBD").  (Id., at ¶¶ 2, 3).  Mrs. Rabadi testified that on her prior visits to Great Wolf Pocono she always rode the DBD with her husband and had no difficulty on those rides.  (Id., at ¶ 6).  Both Mrs. and Mr. Rabadi have acknowledged seeing the waterpark rules and regulations at the Great Wolf Pocono property prior to the DBD ride in which Plaintiff Nissren Rabadi was injured.  (Id., at ¶ 5).  In addition, Mr. Rabadi testified that he viewed the waterpark's rules and regulations online.  (Id.).

The DBD operates as follows: a rider gets into a conveyance at the top of the ride and then enters a flume or a tunnel into the first barrel.  (Id., at ¶ 4).  Within the first barrel, the conveyance would oscillate from one side of the barrel to the other and then travel into a second flume or tunnel leading into the second barrel.  (Id.).  The conveyance would then oscillate within the second barrel and travel into a further flume or tunnel leading to a catch pool at the end of the ride.  (Id.).  While riding the DBD, the Plaintiffs would have sat across from each other on a two person conveyance with their feet directly near the other spouse.  (Id., at ¶ 17).

During the ride at issue, Plaintiffs testified that Mrs. Rabadi's head and arm collided with the wall inside the ride and that Mrs. Rabadi has no recollection of the events after this collision. (*Id.*, at ¶ 7); (Doc. 17, at ¶ 7). Mrs. Rabadi further testified that, at the time of her injury, she was holding onto her conveyance. (Doc. 11, ¶ 8). She does not recall if she separated from her conveyance, or if she fell out of the conveyance. (*Id.*, at ¶ 9). According to Mr. Rabadi, the injury to his wife was caused by increased water flow on the DBD. (*Id.*, at ¶ 15). After the incident, Mrs. Rabadi went to her room at the Great Wolf Lodge where her husband took photographs of her injury.[1] (*Id.*, at ¶ 12).

The parties dispute what caused Mrs. Rabadi's injury. Plaintiffs believe that increased water pressure in the DBD caused the injury, whereas Defendants dispute this theory.[2] Neither party presents an expert witness with respect to the issue of causation. David Hineline, a former waterpark inspector at Great Wolf Pocono, testified that each morning prior to the opening of the waterpark, the water is turned on and the "VFD," the Variable Frequency Drive, is pressured on. (*Id.*, at ¶ 22). Each morning, the maintenance staff will turn on the VFD and the water flow is brought up to the proper flow rate as set by the ride manufacturer. (*Id.*). Mr. Hineline testified that if the water flow dropped to an unacceptable

---

[1] Tristan Field, an employee of Great Wolf Lodge of the Poconos, was the Aquatic Manager on December 18, 2012. (Doc. 11, at ¶ 20). Mr. Fields testified that Mr. Rabadi requested a copy of the Great Wolf Incident Report at the time he asked for directions to the local hospital, the Pocono Medical Center, where Mr. Rabadi took Mrs. Rabadi in the early morning hours of December 19, 2012. (*Id.*, at ¶ 21).

[2] The manufacturer of the DBD ride set the water flow values at the time the DBD waterslide was commissioned. (*Id.*, at ¶ 22).

level, an alarm would go off. (*Id.*, at ¶ 23).  He did not recall, however, whether the alarm system was put in place on the date of Mrs. Rabadi's injury.  (Doc. 17, at ¶ 23).

Chris Ardizoni, currently the Assistant Director of Engineering at Great Wolf Pocono, served as the Maintenance Manager in 2010 and has been affiliated with Great Wolf Pocono since May of 2010.  (Doc. 11, at ¶ 24).  Mr. Ardizoni "described the DBD water flow rates as being determined by set points following the ride commissioning in order to meet the correct flow rates as determined by the ride manufacturer."  (*Id.*, at ¶ 25).  The DBD has flow meters that Mr. Ardizoni described as setup to trigger an alarm if the water flow on the DBD ride is abnormal.  (*Id.*, at ¶ 26).  There is a light at the start tub at the top of the DBD and one in the catch pool at the base of the DBD ride.  According to Mr. Ardizoni, if the water flow is abnormal, the alarm is triggered and the lights will flash alerting the DBD ride staff, and no riders will be dispatched on the ride until the matter is addressed.  (*Id.*).  In addition, a light above the pump room door within the waterpark flashes if the flow alarm is triggered.  (*Id.*).  During the daily operation of the waterpark, Mr. Ardizoni, or a member of the Great Wolf staff, will go into the pump room several times a day to monitor the pressure gauges on each pump and note the readings.  (*Id.*, at ¶ 27).  Mr. Ardizoni stated that "he is unaware of the water on the DBD being anything other than normal at all times on December 18, 2012."  (*Id.,* at ¶ 28).

## III.   **STANDARD OF REVIEW**

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  "As to materiality,

. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a

genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.

Ct. 2548, 91 L.Ed.2d 265 (1986).   A "material fact" is one which might affect the outcome of

the litigation under the applicable law. *Boykin v. Bloomsburg Uni. of Pennsylvania*, 893 F.

Supp. 378, 393 (M.D. Pa. 1995).  A dispute about a "material fact" is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Once the party moving for summary judgment demonstrates the absence of a genuine issue

as to any material fact, the non-moving party must offer specific facts contradicting those

averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife

Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990).  Therefore, the non-

moving party may not oppose summary judgment simply on the basis of the pleadings, or

on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248.

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary judgment rule:

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"'When there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties.'"

6

*Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (quoting *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48. Moreover, "[s]ummary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to the party's case, and for which the party will bear the burden of proof at trial." *Brightwell v. Lehman*, Civil Action No. 03-205J, 2007 WL 2479682, at \*5 (W.D. Pa. Aug. 29, 2007) (citing *Celotex*, 477 U.S. at 317).

## IV. ANALYSIS

### A. Negligence

Plaintiffs bring a negligence action against the Defendants. "Negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 980 A.2d 502, 506 (2009) (internal citations and quotation marks omitted). Under Pennsylvania law, a Plaintiff bringing a cause of action for negligence must allege "the four basic elements of duty, breach, causation, and damages." *Loughran v. The Phillies*, 888 A.2d 872, 874 (Pa. Super. 2005). "To prevail in a negligence action, a plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that

duty, that such breach caused the injury in question, and actual loss or damage." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 61 (3d Cir. 2009) (internal citation and quotation marks omitted).

With respect to the elements of Plaintiffs' negligence claim, Defendants seek summary judgment on the theory that Plaintiffs have not established causation. In addition, Defendant Great Wolf Resorts, Inc. seeks summary judgment with respect to the claims against it based on what it asserts is a "total lack of evidence that they were responsible for the day-to-day operations of the separate corporate entity known as the Great Wolf Lodge of the Poncons, LLC." (Doc. 10, at 5). The Court will first address the issue of causation.

### B. Causation

In support of its Motion For Summary Judgment, Defendants assert that there is no evidence in the record from which the Court could conclude that its acts or omissions, or the alleged breach of its duty of care, caused Plaintiffs' injuries. Specifically, Defendants claim that:

> There is no competent evidence in the summary judgment record to correlate the water flow of the DBD to Mrs. Rabadi being injured. Here, the evidentiary record simply fails to demonstrate a legally sufficient causal connection between any alleged negligence of the Defendant Great Wolf and the Plaintiff's injury.

(Doc. 10, at 14). Plaintiffs, on the other hand, dispute this proposition. Specifically, Plaintiffs' causation argument set forth in its brief in opposition to Defendants' Motion (without any citations to the record or case law) is as follows:

Instantly, a reasonable jury could find that the water pressure on the DBD at the time of the incident was greater than on earlier occasions. This conclusion could be reasonably based on Plaintiffs' testimony regarding their experience on the ride, i.e., the ride was much faster on this occasion than on prior occasions. This conclusion could also be reached based on the conversation between Great Wolf staff members about the high pressure ride. A reasonable jury could further conclude that but for this increased water pressure Plaintiff's head would not have violently collided with the tunnel wall resulting in serious injuries.

For purposes of the summary judgment motion, the Court must ignore the information about the flow meter alarm. Two Great Wolf employees—Mssrs. Field and Hineline—**did not know whether that system was in place in December 2012**.

A reasonably jury could also interpret the fact that there were multiple injuries on the DBD 13 days apart (December 5, 2012 and December 18, 2012) together with the fact that 'chips' and 'leaks' were found on the DBD all throughout December 2012 that Great Wolf should have foreseen an injury such as Plaintiff's could occur. Especially considering Great Wolf also had knowledge of the serious injuries that occurred on the DBD in the Perez case—an incident that predates the instant matter.

In sum, the evidence of record demonstrates Great Wolf's acts or omissions increased the risk of harm to Plaintiff. This evidence furnishes a basis for a jury to find that such increased risk was in turn a substantial factor in bringing about the Plaintiff's injury. This question of proximate causation should be reserved for the jury and requires that this Court deny the motion for summary judgment.

(Doc. 18, at 11-13).

"To satisfy the prima facie element of causation, the plaintiff must establish a causal connection between [the] defendant's conduct and the plaintiff's injury." *Midgette v. Wal-Mart Stores, Inc.,* 317 F. Supp. 2d 550, 563 (E.D. Pa. 2004) (internal citation and quotation marks omitted). "It is the plaintiff's burden to prove that the harm suffered was caused, both factually and legally, by the defendant and that burden must be sustained by a preponderance of the evidence." *Polansky v. Vail Homes, Inc.,* Civil Action No. 13-296,

2016 WL 2643253, at *5 (W.D. Pa. May 10, 2016) (slip copy) (citing *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978)). It is well settled that, under Pennsylvania law, "the mere occurrence of an accident does not establish negligent conduct." *See Iavaroni v. Woodloch Pines Resort*, Civil Action No. 3:14-cv-01327, 2016 WL 796057, at *5 (M.D. Pa. Feb. 26, 2016) (citing *Hillelson v. Renner*, 130 A.2d 212, 214 (Pa. Super. 1957)). Rather, the plaintiff must "prove causation by direct or circumstantial evidence." *Eisenberry v. Shaw Bros., LLC*, Civil Action No. 3:08-1337, 2010 WL 235108, at *4 (M.D. Pa. Jan. 15, 2010). Although the question of causation is generally one for the jury, "when it is clear that reasonable minds could not differ as to causation, the court may decide the issue." *Ross v. Southeastern Pennsylvania Transp. Auth.*, No. 94-CV-2128, 1995 WL 385087, at *3 (E.D. Pa. June 27, 1995) (citing *Hamil*, 392 A.2d at 1285).

In the instant matter, the Court concludes that Plaintiffs have failed to offer evidence from which a reasonable jury could conclude that Defendants' conduct was causally connected to Mrs. Rabadi's injury. Specifically, even if the Court were to assume that Defendants breached their duty of care with respect to maintaining the appropriate level of water pressure on the DBD, or that the Defendants failure to repair certain chips and leaks on the DBD breached their duty of care, Plaintiffs point to no evidence (other than speculation and conjecture) to establish a causal connection between the Defendants' acts

or omissions and Mrs. Rabadi's claimed injury.[3] "To establish proximate cause, plaintiff must set forth facts that support a reasonable inference that the harm would not have occurred absent the conduct and that the alleged breach was an actual, real factor in causing the harm, even if the result is unusual or unexpected." *Vanesko v. Marina Dist. Dev. Co., LLC*, 38 F. Supp. 3d 535, 543 (E.D. Pa. 2014) (internal citation and quotation marks omitted). Plaintiffs have failed to do so for at least four reasons.

*First*, and most notably, Plaintiffs do not proffer an expert report or testimony to establish *any* correlation between increased water pressure on the DBD and Mrs. Rabadi's asserted injury. Nor do Plaintiffs offer any expert report or testimony demonstrating *any* correlation between the so-called "cracks" and "leaks" on the DBD and the alleged injury. It is a "general rule" that the "plaintiff has the burden of presenting expert opinions . . . that the negligent conduct caused the injuries for which recovery is sought." *Simpson v. Fed. Bureau of Prisons*, No. 3:CV-022313, 2005 WL 2387631, at *5 (M.D. Pa. Sept. 28, 2005) (citing *Grossman v. Barke*, 868 A.2d 561, 566-67 (Pa. Super. 2005)). Expert testimony is "necessary when there is no fund of common knowledge from which laymen can reasonably draw the inference or conclusion of negligence." *Jones v. Harrisburg Polyclinic Hosp.*, 437 A.2d 1134, 1138 (Pa. 1981).

---

[3] The DBD's inspection report from the date of the incident, December 18, 2012, merely references "chips" and "leaks" as items that "need attention." (Doc. 16-1, at 2). Plaintiffs do not elaborate on their causation theory with respect to the identified chips of leaks, or with respect to the asserted injuries on the DBD during the month of December 2012. Indeed, Plaintiffs do not identify the number or nature of these alleged injuries, nor attempt to demonstrate a causal connection between the alleged injuries and Mrs. Rabadi's injury.

Expert testimony is not required, however, when a matter "is so simple or the lack of skill

or care is so obvious as to be within the range of experience and comprehension of even

non-professional persons." *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997) (citing

*Jones*, 496 Pa. at 471). The correlation between increased water pressure on the DBD and

Mrs. Rabadi's asserted injury is not so simple and obvious to obviate the need for expert

testimony.[4] The same holds true with respect to any correlation between the "cracks and

leaks" on the DBD and Mrs. Rabadi's injury.[5] Where, as here, "a plaintiff fails to proffer the

---

[4] A review of negligence cases in which water pressure was alleged to have caused the plaintiff's injury reveals that Courts have generally required expert testimony. *See, e.g., Frankenmuth Ins. v. City of Hickory*, 235 N.C. App. 31, 32, 760 S.E.2d 98, 100 (N.C. App. 2014) (noting that the plaintiff's expert opined that the cause of plaintiff's injury "was excessive water pressure from defendant's water supply and potentially a sudden surge in water pressure"); *Ortiz v. Splish Splash at Adventureland*, 851 N.Y.S.2d 59, 2007 N.Y. Slip. Op. 51825(u), at *4 (Sup. Ct. Nassau Cnty. 2007) (granting summary judgment in favor of the defendant waterpark where plaintiff alleged that the water pressure caused his injuries where there was "no expert affidavit . . . with respect to the water jets at the 'Shotgun Falls' slide"); *Printed Terry Finishing Co., Inc. v. City of Lebanon*, 247 Pa. Super. 277, 285, 372 A.2d 460 (Pa. Super. 1997) (noting that plaintiff's experts testified that "the fire would have been extinguished in its incipient stage, if the . . . sprinkler system had been supplied with the proper water pressure level").

[5] A review of negligence cases in which the plaintiff claims injury occurring on the defendant's water slide shows that Courts generally require the plaintiff to proffer expert testimony in order to maintain its claim. *See, e.g., Black v. Kerzner Int'l Holdings, Ltd.*, Case No. 12-60301, 2013 WL 11971267, at *2 (S.D. Fla. Feb. 27, 2013) (ordering that "[t]he Plaintiff shall select and inspect three waterslides in addition to the Abyss when their expert conducts the site inspection"); *Godsoe v. Maple Park Prop., Inc.*, Civil Action No. 06-10405-DPW, 2007 WL 2316468, at *6 (D. Mass. Aug. 9, 2007) ("In any event, a question, as framed by Plaintiff's expert, of material fact exists concerning whether the water depth was adequate to effectively cushion a slider from striking the lake bottom if the slider descended the slide in any position other than seated with feet pointing forward."); *Ortiz*, 851 N.Y.S.2d 59; *Fowee v. Paramount Parks, Inc.*, No. CA98-09-116, 1999 WL 138694, at *2 (Ohio Ct. App. Mar. 15, 1999) (noting that the plaintiff "provided expert testimony" which "concluded that the water flow in the left flume, the flume in which appellant was injured, was faster than the water flow in the right flume").

In addition, at least one Court in Pennsylvania has previously granted summary judgment to the defendant waterpark where, as here, the plaintiff failed to demonstrate a causal connection, through expert testimony, that the waterpark's acts or omissions caused the asserted injury. *See Richmond v. Wild River Waterpark, Inc.*, No. 1972 MDA 2013, 2014 WL 10789957, at *4 (Pa. Super. Oct. 6, 2014) ("[N]owhere

required expert evidence in response to a properly supported motion for summary

judgment, summary judgment is appropriate." *Redding v. Estate of Sugarman*, 535 F. App'x

99, 101 (3d Cir. 2013); *see also Estate of Aptekman v. City of Philadelphia*, 127 F. App'x

619, 622 (3d Cir. 2005) ("Because Appellants failed to produce any expert testimony that

any of the defendants' actions caused, increased the likelihood of, or hastened [plaintiffs']

demise, the District Court properly concluded that there was no issue of material fact with

respect to causation for any of the above causes of action.").  Absent any evidence

specifically linking increased water pressure on the DBD, the alleged prior injuries, or the

so-called "chips and leaks," to Mrs. Rabadi's injury, Plaintiffs cannot satisfy the causation

element of their negligence claim and summary judgment is warranted. *See Cabrera v.

Ross Stores of Pennsylvania, L.P.*, __ F. App'x __, 2016 WL 1296210, at *1 (3d Cir. Apr. 4,

2016) (holding that the district court properly granted summary judgment in slip and fall

---

does the record show a causal connection (through expert testimony or otherwise) to establish that the type of inner tube supplied caused [plaintiff's] injury."). The *Richmond* Court found the plaintiffs' conjecture to be speculative, and their self-serving testimony insufficient to establish a causal connection between the defendant's breach of its duty of care and the resulting injury, noting:

> [V]iewing the evidence in the light most favorable to the [plaintiffs] as the non-moving party, the [plaintiffs] failed to establish the causal connection that the type of inner tube [plaintiff] used contributed to his injury. A dispute over whether the inner tube had a covered bottom does not make it a material fact 'essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.' Pa.R.C.P. 1035.2. Rather, the [plaintiffs] were required in the first instance to offer some evidentiary basis upon which a jury reasonably could conclude that an unsuitable inner tube existed in the park and caused [plaintiff] to sustain his injuries. Accordingly, the trial court did not err in granting summary judgment to Wild River Waterpark.

*Id.* at *5.

action where the plaintiff failed to offer expert testimony and "could not prove the causation element of her claims absent expert testimony").

*Second*, despite their failure to provide any expert testimony demonstrating a causal connection between Defendants' acts or omissions and Mrs. Rabadi's injury (as well as their failure to present any medical causation testimony) Plaintiffs maintain summary judgment must be denied by pointing to what they assert was a statement from an unidentified employee of Defendants establishing such a connection. Specifically, Mr. Rabadi testified in his deposition that an unnamed maintenance worker employed by the Defendants commented upon the water flow in relationship to Mrs. Rabadi's injury, stating that the injury may have occurred because "the water pressure *might* be too high." (Doc. 13, at 27). In his deposition, Mr. Rabadi was asked to elaborate on this interaction and the following exchange occurred:

> Q: Mr. Rabadi, in the answers to interrogatories which I reviewed with your wife, and you were here for my questioning, there's a reference in the interrogatories to you or your wife or both overhearing a conversation between a maintenance person at Great Wolf, who your wife has testified to as a male, speaking with a supervisor at Great Wolf who, your wife has testified to, was a male, and it was overheard that they were talking about the flow differential or the difference in flows on the ride. Did you hear that conversation?

> A: Yes, I did, actually. My wife had a bag of ice on her head. A young lady brought a bag of ice while we were there and I wanted to know what happened, what happened with this ride. I was actually asking more questions because I was a little bit frustrated what happened to my wife and the gentleman, the supervisor there, was talking to the maintenance guy, 'What do you think could have happened,' and the maintenance guy, which looked right in my eyes and looked at the supervisor, said, 'The water pressure might be too high. Should we shut the ride down,' and the supervisor said, 'Yes, shut the ride down until we find out what's happening.' I said

14

to them 'Is there a video camera?' The supervisor said 'Yes, there is a camera. We'll find out what happened, actually, in the ride.' Because there was music, loud music going on, flashing lights inside the music, inside the tunnel, and that they will look at the video camera and they'll see what actually happened with the ride.

Q: Let me ask you this: Did the person or persons who you heard speaking, the supervisor and the maintenance worker, did they have nametags on them?

A: Yes, they did, and I didn't – do not recall their names.

Q: Can you share with me their names today?

A: No.

Q: You seem to have a pretty good recollection of events from that day. Correct?

A: Absolutely.

Q: What do they look like? Let's start with the maintenance worker.

A. Maintenance worker. He had – there's so many people I've seen I'm trying to remember his face exactly.

Q: Forget his face. Tell me what type of clothing he had on.

A. He had a blue and – blue and – like a blue striped shirt and the supervisor had a white colored shirt on.

Q: Were the shirts long sleeves or –

A: Short-sleeved.

Q: Did they have shorts on or bathing trunks?

A: Oh, I don't recall, I don't remember.

Q: Did either of them have glasses?

A: I don't recall that, their face.

Q: What was the height of the supervisor?

A: I don't know.

Q: What was the hair color of the supervisor?

A: I'm trying to remember . . . black hair.

Q: And the maintenance worker, what was his height?

A: I don't know.

Q: And what was – the maintenance worker with the blue striped shirt as opposed to the white colored shirt, what did the maintenance worker – what color hair did he have?

A. I'm sorry, let me go back. The maintenance worker had black hair and – like a brownish-black hair and the supervisor had like a brownish-blond hair. Like a brownish-brown, blondish-brown hair. The maintenance worker had black, like dark brown hair.

Q: Do you recall the height of the maintenance worker?

A: No I don't.

Q: Where did you overhear this conversation?

A: Right before the medical – when you first walk into the medical booth is on the right. Between the medical booth and the double door way before you exit out of the park.

(Doc. 13, at 27-30).[6]

---

[6] Mrs. Rabadi testified to this interaction as follows:

Q: You also said you overheard or 'We overheard a maintenance person inform a supervisor that the accident may have occurred because the water pressure was too high.' Do you know the name of the maintenance person that you were listening to?

A: No.

Q: Do you know the name of the supervisor that the maintenance person was talking to?

Plaintiffs' recollection of this conversation is insufficient to preclude summary judgment and does not support its theory of causation.  Such a statement is hearsay, entirely speculative (*i.e.* "the water pressure *might* be too high), and insufficient to demonstrate a causal connection between Defendants' breach of duty and Mrs. Rabadi's injury.  While it is true, as Defendants note, that hearsay statements may be considered on a motion for summary judgment if they are capable of admission at trial, *see Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2. (3d Cir. 2000) (citations omitted), here, the

A:  No.

Q:  Do you know what that person looks like?

A:  No, I don't remember.

Q:  Is that – but the maintenance person, is he a male or she a female?

A:   I think he's male.

Q:  And the supervisor who this male maintenance worker was speaking with, is she a female or is he a male?

A:  Male.

Q:  So, the male maintenance person was informing the male supervisor that the accident may have occurred because the water pressure was too high?

A:  Yes.

Q:  Once you heard that what did you say to either the maintenance person or the supervisor?

A:  I don't say nothing.

Q:  Did your husband say anything?

A:  Maybe he say something, I don't remember.

(Doc. 12-1, at 60-61).

statement is not capable of admission at trial (and Plaintiffs make no argument to the contrary). Indeed, Plaintiffs neither contest Defendants' assertions that such a statement is hearsay and incapable of admission of trial, nor direct the Court to a particular exception to the hearsay rule that would apply on these facts. Courts in this Circuit have routinely held that hearsay statements by unidentified employees are inadmissible at trial.[7] *See, e.g.*, *Canton v. Kmart Corp.*, 470 F. App'x 79, 84 (3d Cir. 2012) (affirming district court's refusal to admit hearsay statement by unidentified employee "because the identity of the employee was not known, it was not possible to determine if the statement was made by the woman within the scope of her employment"); *Mathis v. Monza*, Civil Action No. 11-450, 2013 WL 1058867, at *2 (W.D. Pa. Mar. 14, 2013) ("For Rule 801(d)(2)(D) to apply, the statement must concern matters within the scope of the declarant's agency or employment. While Plaintiff could argue that the statement made by the correctional officer could fall under this exclusion to the hearsay rule, it is fatal to Plaintiff's argument that he cannot affirmatively identify either of the two correctional officers. Without knowing the identity of the alleged employees, Plaintiff cannot establish that the statement was made within the scope of their employment."); *Waters v. Genesis Health Ventures, Inc.*, No. Civ.A. 03-CV-2909, 2005 WL 1279125, at *6 (E.D. Pa. May 25, 2005) (holding that the witnesses' "vague recollections of unidentified employees' perceptions . . . does not constitute 'matter within the scope of the

---

[7] Courts in Pennsylvania have reached the same conclusion. *See, e.g.*, *Harris v. Toys 'R' Us-Penn, Inc.*, 880 A.2d 1270 (Pa. Super. 2005) (unidentified declarant's hearsay statement was not admissible under hearsay exception for admissions by a party opponent); *DeFranceso v. Western Pennsylvania Water Co.*, 478 A.2d 1295 (Pa. Super. 1984) (out of court statement allegedly made by unidentified employee of defendant was inadmissible hearsay).

agency or employment' as required by Rule 801(d)(2)(D). Furthermore, the statements do not qualify as present sense impressions"). Plaintiffs have not satisfied their burden to demonstrate that this statement is capable of admission at trial because: (1) the identity of the individual is not known; and (2) it is not possible to determine that the statement was made by an employee within the scope of his employment. *See* Fed. R. Evid. 801(d)(2)(D). Accordingly, it is inappropriate to consider this hearsay statement in connection with Defendants' Motion.

*Third*, the Court finds that Plaintiffs have failed to present sufficient circumstantial evidence to allow a reasonable jury to infer causation. "Although a party may prove its case with circumstantial evidence, 'there is a limit to the inferences that the jury may reasonably draw from such circumstantial evidence.'" *Cmty. Preschool & Nursery of East Liberty, LLC v. Tri-State Realty, Inc.*, 430 F. App'x 125, 127 (3d Cir. 2011) (quoting *Fitzpatrick v. Natter*, 961 A.2d 1229, 1241 (Pa. 2008)). "[W]hile the jury may draw reasonable inferences, it may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but . . . there must be evidence upon which logically its conclusion may be based." *Fitzpatrick*, 961 A.2d at 1241-42 (internal citation and quotation marks omitted). "Whether the plaintiff has offered sufficient circumstantial evidence of causation is normally a question of fact for a jury to decide. However, the question must be removed from the jury's consideration when the circumstantial evidence adduced would force the jury to speculate or guess as to whether a particular act by the defendant was the physical cause of the plaintiff's injury."

*Runfola v. Marmaxx Operating Corp.*, Civil Action No. 11-0052, 2013 WL 3305442, at *4

(W.D. Pa. July 1, 2013) (citing *Hamil*, 392 A.2d at 1284).

This is such a case where the jury would be forced to speculate and guess as to

whether the Defendants' acts or omissions caused the asserted injury. As the Court

previously discussed, the Plaintiffs have not offered any expert testimony demonstrating any

correlation between Defendants' acts or omissions and Mrs. Rabadi's injury. Moreover, Mr.

Rabadi's self-serving and speculative testimony that the ride on the DBD that allegedly

caused Mrs. Rabadi's injury was much faster than their previous rides is insufficient

circumstantial evidence of causation to preclude summary judgment.[8] Plaintiffs' testimony

that the ride at issue felt faster than usual may well have created a genuine issue of fact as

to whether the ride, in fact, was faster than usual. It did not, however, create a genuine

dispute of material fact as to whether Defendants' negligence caused Plaintiffs' injury.[9] *See*

---

[8] When asked whether there was "anything that the staff did or didn't do that caused your wife's injuries," Mr. Rabadi testified: "No. It's a ride, a ride that went down and it was a default by the machine. I mean, the staff couldn't be inside the tunnel to save us. They were at the one end and the other one was on top. How would they save us?" (Doc. 13, at 39).

[9] In addition, Mrs. Rabadi testified that she did not know what caused her to injure herself on the DBD. (Doc. 12-1, at 28). This answer is contrary to her response to an interrogatory that asked her to "State whether you contend that the condition which caused your injury resulted from other defects (please describe)." (Doc. 12-1, at 59). Mrs. Rabadi responded:

Water pressure too high. We rode the DBD once earlier in the afternoon of the incident without any issues. When we rode the DBD the second time we immediately noticed the ride was moving us at a much greater speed. The increased speed caused our tube to ride high on one end of the tunnel (almost capsizing), and then down to the other end of the tunnel with such force that the entire left side of Mrs. Rabadi's body made contact with the tunnel wall. We later overheard a maintenance person inform a supervisor that the accident may have occurred because the water pressure was too high. (*Id.*).

*Divittorio v. United States*, 63 F. App'x 604, 607 (3d Cir. 2003) (noting that "the District Court assumed, and we will assume, that [the plaintiff's] testimony that the elevator descended to the basement at faster than normal speed created a genuine issue of fact as to whether the elevator did, in fact, descend at faster than normal speed" but concluding that it did not create a genuine issue of material fact as to whether the defendant's negligence caused plaintiff's injuries and affirming summary judgment for the defendant). Moreover, the uncontroverted testimony before the Court demonstrates every employee of the Defendants who testified was unaware of any issues with the water pressure on the date of Mrs. Rabadi's alleged injury, and that there was never a time when the water pressure on the DBD was too high. These statements by Defendants' employees are referenced not because the Court credits their accuracy or truthfulness, but rather only to show that Plaintiffs have failed to come forward with evidence of their own which creates a genuine dispute of material fact for trial.[10]

---

[10] Chris Ardizoni, the former Maintenance Manager of Defendants, averred that he was "unaware of the water flow on the DBD being anything other than normal on the December 18, 2012, the date in which the Plaintiff, Nissren Rabadi asserts injury." (Doc. 16, at 3-4). Moreover, Tristan Field, Defendants Aquatics Manager at the time of the incident, testified that he could not recall a time when there was a water flow issue with the slide. Specifically, he stated that "I can't remember a time where we had – randomly a water flow issue except for maybe a storm nearby and the power goes out and we just know right away the water flow is down, so we close the rides. Besides that, I haven't had any case that I can remember that happening." (Doc. 15, at 23). Mr. Hineline, a former pool technical for the Defendants, testified that "We did have a few incidences, time frame I do not know, where we had a pump that would kick off and we had an alarm outside the Double Barrel Drop that would go off if our water level dropped to let us know that the pump shut off, but other than those few times that we had that issue, no, we didn't have any incidents where we were having a different flow." (Doc. 15, at 34-36).

While this testimony demonstrates that there were some incidents where the water pressure was too low, there is no testimony before the Court identifying a time when the water pressure was too high.

Nor do Plaintiffs' arguments that previous injuries on the DBD, as well as chips and

leaks on the slide, permit a reasonable jury to infer a causal connection between

Defendants' breach of a duty of care and Plaintiffs' injury.  Plaintiffs do not argue that

Defendants should have shuttered the DBD due to these alleged unidentified previous

injuries.  They do not argue that Defendants failed to properly maintain the ride, or that such

failure caused Mrs. Rabadi's injury.  Nor do they even attempt to hypothesize how the

Defendants' failure to repair the so-called cracks and leaks caused Mrs. Rabadi's injuries

(or affected the water pressure on the DBD).[11]  (Doc. 12-1. at 62).  Moreover, although

Plaintiffs point to multiple injuries on the DBD occurring from December 5, 2012 through

December 18, 2012, they fail to identify the nature of these injuries or argue any correlation

between these injuries and Mrs. Rabadi's injuries.  And although Plaintiffs repeatedly cite to

the *Perez* case as somehow proof of Defendants' negligence, in that case, unlike the

present case, the plaintiffs cited to expert testimony demonstrating a correlation between

the defendants' conduct and the plaintiff's injury.  *See Perez v. Great Wolf Lodge of the*

*Poconos, LLC*, No. 3:12-CV-01322, 2016 WL 4051282, at *8 (M.D. Pa. July 26, 2016).  In

---

Plaintiffs point to nothing in the record to create an issue of fact as whether the water pressure on the DBD was too high. Furthermore, the Court's independent review of the record does not reveal any testimony or evidence that the water pressure was too high. When asked if the water pressure was ever too high Mr. Hineline testified that it was "[n]ever too high. . . . I've seen some where it might drop below a thousand and then kick right back up, but, no, never where it would be too high." (Doc. 15, at 37).

[11] Mr. Hineline testified that one of his employment duties was to check for chips and cracks in the slides. He testified that the purpose of this was "making sure the seams around the slides inside are smooth. You don't want any chips, cracks, anything like that that could maybe pop a tube, get somebody -- if it's a body slide, catch their skin on their clothing." (Doc. 15, at 16). When asked if the chips and leaks could affect the flow of water on the ride, Mr. Hineline testified "no." (*Id.* at 27).

addition, the injury sustained in *Perez* and the plaintiff's theory of causation—supported by expert testimony—are vastly different than those alleged here and do not support a finding of negligence. *Id.* Speculation and conjecture is not evidence, and "[e]ven though we must draw all legitimate inferences in [the plaintiff's] favor . . . [t]he possibility of the existence of an event does not tend to prove its probability."[12] *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (holding that the plaintiff failed to present adequate evidence of causation and affirming district court's entry of summary judgment in favor of the defendant in negligence action). The mere occurrence of an accident, without more, does not establish negligent conduct. *See Iavaroni*, 2016 WL 796057, at *5.

*Finally*, the Court concludes that the doctrine of *res ipsa loquitur* has no application in the case at bar. "Circumstantial evidence when used to prove negligence must be distinguished from the doctrine of *res ipsa loquitur*. The doctrine of *res ipsa loquitur* combines circumstantial evidence with a presumption on the burden of proof." *Fedorczyk*, 82 F.3d at 74. The doctrine provides that "in certain cases the circumstantial evidence is sufficient for negligence to be presumed, and the burden of proof shifts to the defendant to rebut some element of the case." *Id.* Application of *res ipsa loquitur* "must be carefully limited." *Simpson*, 2005 WL 2387631, at *6. The Pennsylvania Supreme Court has

---

[12] "What is required is evidence, which means some form of proof; and it must be evidence from which reasonable persons may conclude that, upon the whole, it is more likely that the event was caused by negligence than it was not." *Galullo v. Fed. Express Corp.*, 937 F. Supp. 392, 397 (E.D. Pa. 1996) (citations omitted). "As long as the conclusion is a matter of mere speculation or conjecture, or where the probabilities are at best evenly balanced between negligence and its absence, it becomes the duty of the court to direct the jury that the burden of proof has not been sustained." *Id.*

adopted the Restatement (Second) of Torts formulation of the *res ipsa loquitur* doctrine.

*See Jones*, 496 Pa. at 470.  The restatement provides:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the
   defendant when;

   (a) The event is of a kind which ordinarily does not occur in the absence of
      negligence;

   (b) Other responsible causes, including the conduct of the plaintiff and third
      persons, are sufficiently eliminated by the evidence; and

   (c) The indicated negligence is within the scope of the defendant's duty to the
      plaintiff.

(2) It is the function of the court to determine whether the inference may reasonably be
   drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any
   cases where different conclusions may reasonably be reached

Restatement (Second) of Torts § 328D.

Here, the event at issue—hitting one's face and arm on the side of a waterslide—is not

the type of injury that "ordinarily does not occur in the absence of negligence." *Cf. Estate of*

*Edward W. Knoster v. Ford Motor Co.*, 200 F. App'x 106 (3d Cir. 2006) (*res ipsa loquitur*

doctrine applicable in plaintiff's claim of design defect in cruise control that caused sudden

acceleration without any driver input); *Jones*, 496 Pa. at 465 (*res ipsa loquitur* doctrine

applicable in medical malpractice action).  This is not the type of situation where "[t]he need

for an inference of negligence is especially obvious" such as "where a patient submits

himself or herself to the care and custody of doctors and nurses, is rendered unconscious,

and receives some injury from instrumentalities used or procedures employed in his or her treatment." *Jones*, 496 Pa. at 474.    In addition, Plaintiffs "failed to produce evidence eliminating other potential causes" of the claimed injury—including Mr. or Mrs. Rabadi's own conduct. *Cox v. Wal-Mart Stores East, L.P.*, 350 F. App'x 741, 744 (3d Cir. 2009).   There is no evidence of record that Mrs. Rabadi's injury occurred as a result of any negligence on the part of the Defendants. *See Ortiz*, 851 N.Y.S.2d at *7 (rejecting *res ipsa loquitir* argument and granting summary judgment for the defendant where "Plaintiffs do not know what caused the accident but speculate it was due to the water pressure. They have not demonstrated that a defect in the water pressure existed at the time of the accident, nor demonstrate that [the defendant] was negligent or that [the plaintiff's] own actions did not contribute to the injury. It is the view of the Court that this accident could have occurred without any negligence on the part of [the defendant]."). *See also Fleegle*, 1999 WL 960575, at *5 ("In the present case, *res ipsa loquitur* was not applicable because the physical injury sustained by [the plaintiff] was not the result of some unusual occurrence or happening. There was absolutely nothing in [the plaintiff's] testimony or the other evidence . . . which suggested otherwise. Indeed, the sum total of [the plaintiff's] testimony was that he injured his right shoulder by bumping it against the wall of Slide D as he rode down the water slide. . . . The injury sustained by [the plaintiff] did not occur under such circumstances that it would not have occurred in the usual course of events if ordinary care was observed. To the contrary, [the plaintiff's] injury was exactly the type of mishap that

would still be expected even given the exercise of ordinary care by appellees").

Accordingly, the doctrine of *res ipsa loquitur* does not apply on these facts.

In sum, Plaintiffs' failed to present evidence from which a reasonable jury could conclude that Defendants' acts or omissions caused Plaintiffs claimed injury. "It is axiomatic that a jury cannot be permitted to return a verdict based merely on speculation or conjecture." *Iavaroni*, 2016 WL 796057, at *5 (citing *Smith v. Bell Tele. Co.*, 153 A.2d 577, 479080 (Pa. 1959)). "Absent medical, scientific, or other quantitative and qualitative evidence of causation and harm, a jury could only speculate as to the ultimate issues needed to be proved at trial." *Ford v. Mercer Cnty. Correctional Cent.*, 171 F. App'x 416, 421 (3d Cir. 2006). Viewing all the evidence in the light most favorable to the Plaintiffs, the Court concludes that there is no genuine dispute of material fact with respect to causation and will grant Defendants' Motion for Summary Judgment in its entirety.[13]

## V.   CONCLUSION

For the reasons set forth above, Defendants' Motion For Summary Judgment will be granted in its entirety. A separate order follows.

Robert D. Mariani
United States District Judge

---

[13] Because the Court is granting Defendants' Motion for Summary Judgment, it need not address Defendants' position that Great Wolf Resorts is an improper defendant.